Matthew STANFORD, Plaintiff,

and

Kentucky Association of Counties Workers' Compensation Fund, Intervenor Plaintiff,

v.

UNITED STATES of America, Defendant and Intervenor Defendant.

United States of America, Third–Party Plaintiff,

v.

United States Army Cadet Corps, Inc., et al., Third–Party Defendants.

Civil No. 12–93–ART.

United States District Court, E.D. Kentucky, Southern Division, London.

May 31, 2013.

Christopher P. Evensen, Evensen Law Office, William J. Driscoll, Driscoll & Associates, P.S.C., Louisville, KY, for Plaintiff.

Scott M.B. Brown, Fogle, Keller, Purdy, PLLC, Tighe Alexander Estes, Ferreri & Fogle, Lexington, KY, for Intervenor Plaintiff.

Anna R. Gwinn, Callie R. Owen, U.S. Attorney's Office, Lexington, KY, for Third–Party Plaintiff, Defendant, Intervenor Defendant.

Erwin Roberts, Frost Brown Todd LLC, Louisville, KY, Darrell L. Saunders, Darrell L. Saunders, PSC, Corbin, KY, John G. Irvin, Jr., Robert Coleman Stilz, III, Shelby C. Kinkead, Jr., Kinkead & Stilz, PLLC, Lexington, KY, Benjamin Adam Long, Attorney General's Office, Frankfort, KY, for Third–Party Defendants.

## MEMORANDUM OPINION AND ORDER

AMUL R. THAPAR, District Judge.

The Bluegrass Area Development District ("BADD") is one of fifteen area development districts in the state of Kentucky. Area development districts are inter-county bodies, created by state law, that work with the local governments in their respective regions on a broad range of policy

goals. BADD has filed a motion asserting sovereign immunity under Kentucky law and moving for summary judgment on the third-party complaint and crossclaims brought against it. In the alternative, BADD argues for a judgment on the pleadings because neither the third-party complaint nor the crossclaims assert cognizable indemnity or apportionment claims against BADD.

The Court will deny the motion in part and grant it in part. BADD's motion for summary judgment on state sovereign immunity grounds fails because BADD does not perform a function integral to state government. But BADD's alternative argument has some merit. Both the United States and the crossclaimants fail to allege the kind of facts necessary to make out an indemnity claim under Kentucky law. But the United States and the crossclaimants do bring claims for contribution, which is a separate cause of action in Kentucky and also supports their claims for apportionment. The Court will therefore grant judgment for BADD on the indemnity claims, but not the apportionment claims.

## BACKGROUND

This case arises out of a terrible accident at the Harold L. Disney Training Center ("Training Center"), a federal military training ground in Knox County, Kentucky. R. 1 at 2 ¶¶ 10–11. Matthew Stanford, the plaintiff in this case, visited the training center as part of his summer job working as an instructor for the U.S. Army Cadet Corps, Inc. ("Cadet Corps"). Id. at 3 ¶¶ 13–18. The Cadet Corps is a private corporation with no official ties to the military. R. 23 at 7, 9 ¶¶ 22, 30–32. Stanford worked as an instructor in the summer program, leading youths between

ages twelve and eighteen through training exercises and other activities. R. 1 at 3 ¶¶ 15–16. As part of the summer program, the Cadet Corps visited the Training Center for three days. Id. at 3 ¶ 17. On the final day of the visit, July 23, 2009, Stanford and other instructors led a group of youths through the Training Center's obstacle course. Id. at 4 ¶ 23. The fifteenth obstacle required participants to slide down a long zip line, suspended eighteen feet above the ground with no safety net. Id. at 4 ¶¶ 27–30. Unbeknownst to Stanford, the zip line was not ready for use. Id. at 5 ¶ 42. While several youths successfully completed the zip line before Stanford, he did not. Id. at 4 ¶¶ 32–34. Stanford fell to the rocky ground below,[1] fracturing his hip and his cervical spine. Id. at 4 ¶¶ 29, 34–35. Stanford is now a quadriplegic and requires daily nursing assistance to get out of bed, bathe, dress, and use the bathroom. Id. at 4–5.

Stanford sued the United States under the Federal Tort Claims Act. R. 1; R. 3.[2] He claims that the United States failed to warn him that the zip line was not ready for use, either by marking the zip line as "Out of Order" or telling the Cadet Corps instructors directly. R. 1 at 5–7 ¶¶ 39–57. Stanford also alleges that the United States failed to take reasonable steps to guard against an accident on the zip line, negligently designed the zip line, and breached their general duty of reasonably maintaining the premises of the Training Center. Id. at 8–9 ¶¶ 71–87. Finally, he claims that the United States' employees violated various safety standards in the Training Center's operating procedure and Army regulations. R. 81 at 2 ¶¶ 2–5.

The United States was quick to disavow any fault in Stanford's accident. See R.

---

1. It is not clear from the pleadings whether Stanford fell because he lost his grip or because the zip line malfunctioned in some way.

2. Stanford has also sued the Cadet Corps and several of its members in state court. See R. 23 at 12–13 ¶ 48.

11. It also sought to shift whatever blame there was onto Stanford's supervisors. The United States filed a third-party complaint seeking indemnity, apportionment, and contribution against several parties who were involved with Stanford's work as an instructor.[3] R. 23 at 13–14 ¶¶ 51–52. First, it named the Cadet Corps and its director, Joseph Land. *Id.* at 2–3, 13–14, 10 ¶¶ 2–3, 49–52. Second, it named five members of the Cadet Corps involved in the visit to the Training Center: Jimmy Macon, William Nordan, Richard Wyland, Joseph Gorman, and David Parker. *Id.* at 3–4, 13–14 ¶¶ 4–8, 49–52. Finally, it named the Bluegrass Area Development District ("BADD"). *Id.* at 4, 13–14 ¶¶ 9, 49–52.

What role did BADD play in the accident? After Stanford volunteered to be a Cadet Corps instructor, he applied to BADD's "By Learning U Earn" Program ("BLUE Program"). *See* R. 23 at 8 ¶ 24; R. 70–1 at 3. The BLUE Program is a summer job program that provides "work experience for low-income and disadvantaged individuals ages sixteen through twenty-four." *Uninsured Employers' Fund v. Stanford,* 399 S.W.3d 26, 29–29 (Ky. Mar. 21, 2013); *see also* R. 23 at 8 ¶ 24 (alleging same).[4] The BLUE Program pays participants minimum wage for thirty hours of work per week at participating employers, dubbed BLUE worksites. *See Stanford,* 399 S.W.3d at 28–29. The Cadet Corps had successfully applied to be a BLUE worksite. *See Stanford,* 399 S.W.3d at 28–29; *see also* R. 23 at ¶ 24

(same). However, the Cadet Corps' application indicated that BLUE program participants like Stanford would perform relatively innocuous duties such as cleaning and ground maintenance, clerical work, food preparation, and community relation activities. *See* R. 23 at 8 ¶ 24; R. 70–1 at 3. There was no mention of leading field trips, conducting training exercises, or participating in any potentially dangerous activities. *See* R. 23 at 8 ¶ 24; R. 70–1 at 3.

Shortly after the United States filed its third-party complaint, the third-party defendants responded. The Cadet Corps and two of its members (collectively "Crossclaimants") filed counterclaims against the United States and crossclaims against BADD. *See* R. 43 (Cadet Corps); R. 44 (Land); R. 45 (Gorman).[5] Similarly, BADD filed counterclaims against the United States and crossclaims against the Cadet Corps and its six individual members named in the third-party complaint. *See* R. 35.

BADD now moves for judgment on those claims against it on state-law sovereign immunity grounds. R. 70 at 4–10. In the alternative, BADD argues that the United States and the Crossclaimants fail to state a valid claim for indemnity or apportionment. *Id.* at 11–15.

### DISCUSSION

**I. BADD's Motion for Summary Judgment Based on State Sovereign Immunity**

Since the original action was brought under the Federal Tort Claims Act

---

3. The United States filed a second third-party complaint against the Commonwealth of Kentucky's Department of Military Affairs. *See* R. 24. BADD's motion does not implicate that complaint.

4. The BLUE Program is funded through the Workforce Investment Act, which is administered by the United States Department of Labor. *See* R. 70–1 at 3.

5. As for the other Cadet Corps members, William Nordan simply answered the third-party complaint without filing a counterclaim or crossclaims, *see* R. 50, while Jimmy Macon, Richard Wyland, and David Parker have yet to respond to the third-party complaint at all.

("FTCA"), BADD's motion turns on state law and Kentucky's doctrine of sovereign immunity. Under that doctrine, BADD is totally immune from suit if it performs a function that is integral to state government. But BADD cannot establish two necessary prerequisites for sovereign immunity: (1) that the balance of BADD's activities serve state-level government interests; and (2) that BADD is integral to state government functions. The motion will therefore be denied.

## A. Standard of Review for Summary Judgment

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Since BADD brought the motion, the Court must view the evidence in the light most favorable to the United States and the Crossclaimants, drawing all justifiable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). That presumption does not mean, however, that the United States and the Crossclaimants have no burden. To survive summary judgment, they must identify sufficient evidence in the record for a reasonable jury to return a verdict for them on their claims. *Id.* The Court assesses the legal sufficiency of the evidence, not its credibility or weight. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (collecting cases applying Rule 56(c) and Rule 50).

## B. The FTCA and State Sovereign Immunity

Stanford sued the United States under the FTCA, so his claims are analyzed under Kentucky law. *See* R. 3. Under the FTCA, individuals may sue the United States in federal district court for negligent or wrongful acts or omissions. 28 U.S.C. § 1346(b)(1). The FTCA simply applies the state law of the jurisdiction. *Id.; see also Premo v. United States*, 599 F.3d 540, 545 (6th Cir.2010) ("First the district court applies local law to determine liability and to assess damages." (quotation omitted)). In that way, the FTCA puts the United States in the position of a private person by allowing plaintiffs to bring the same state-law tort claims they would bring against a private defendant. *Id.* So Stanford's suit against the United States is, in effect, a suit under Kentucky law.

The claims between the United States and the third-party defendants are also based on Kentucky law. Where, as here, the United States brings a third-party complaint under the FTCA, that complaint is treated like a state-law claim brought by a private person. *See Hill v. United States*, 453 F.2d 839, 842 (6th Cir. 1972) (treating the United States' contribution claim against Tennessee as "derivative" of Tennessee's liability to the individual plaintiffs involved in the case). Similarly, the crossclaims the third-party defendants brought against each other are state-law claims. *See Premo*, 599 F.3d at 545. So all the claims against BADD— whether brought by the United States or by the Cadet Corps and its members—are analyzed under Kentucky law. Thus, the parties may also raise state-law defenses, such as the state sovereign immunity defense that BADD raises here. *See* R. 70. Since state law controls under the FTCA, state sovereign immunity plays a role that it would not if this claim were brought under substantive federal law. *Compare Hill*, 453 F.2d at 840–41 (applying Tennessee's sovereign immunity doctrine to the United States' claim for third-party contribution against Tennessee), *with*

*United States v. Mississippi*, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) (analyzing a claim brought by the United States against Mississippi under the Civil Rights Act of 1960 in terms of the Eleventh Amendment and Congress's constitutional powers). The Court therefore looks to Kentucky's doctrine of sovereign immunity to determine whether BADD is immune from the claims brought against it.

## C. Sovereign Immunity Under Kentucky Law

■ To determine whether governmental and quasi-governmental entities that do not fall into the conventional categories of city, county, and state-level government enjoy state sovereign immunity, Kentucky courts apply a two-step test. *See Comair, Inc. v. Lexington–Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 94–95, 99 (Ky.2009). The test applies to BADD because, as an area development district, BADD does not fall into an established level of government. Instead, it works with the municipal and county governments in its intercounty region on various projects and issues within their respective region. *See* R. 70–4 at 12.

Under the *Comair* test, Kentucky courts ask two questions to determine whether an entity such as BADD qualifies for sovereign immunity. First, they examine the entity's origin, whether it "is an agency (or alter ego) of a clearly immune entity." *Comair*, 295 S.W.3d at 99. Next, courts assess whether the entity performs "a function integral to state government." *Id.* (internal quotation marks omitted). Courts make that assessment by looking at the balance of an entity's functions, not just the particular action at issue in the case. *See id.* at 98 (explaining that the entity must be *"viewed as a whole"* (quotation omitted)); *N. Kentucky Area Planning Comm'n v. Cloyd*, 332 S.W.3d 91, 95–96 (Ky.Ct.App.2010) (assessing the balance

of an area planning commission's activities).

If the answer to both questions is "Yes," then the entity is totally immune from tort liability. If not, then the entity is subject to suit. *Sanitation Dist. No. 1 v. McCord Plaintiffs*, —— S.W.3d ——, 2013 WL 275602, at *2 (Ky.Ct.App. Jan. 25, 2013) ("[I]f either is absent, the entity enjoys no immunity."). BADD passes the first step, but not the second.

### 1. BADD's Origin

■ The parties agree that BADD satisfies the first step of the sovereign immunity analysis. *See* R. 74 at 7–8 (focusing solely on the functional analysis); R. 76 at 4 (same). An entity will satisfy the first step if its "parent" entity—the governmental body that created it—is fully immune. *Comair*, 295 S.W.3d at 99. BADD was created by the Kentucky legislature and is designated as a "public agency" under state law. *See* Ky.Rev.Stat. §§ 147A.050(15), 147A.080(10). Thus, BADD is a political subdivision of the state. *See id.* § 65.230. And since the state enjoys total immunity, BADD satisfies the first step. *See Comair*, 295 S.W.3d at 99.

### 2. BADD's Role in the Function of State Government

■■ To show that it performs "a function integral to state government," BADD must establish two elements. *Comair*, 295 S.W.3d at 99 (internal quotation marks omitted). First, BADD must show that it addresses "state level government concerns that are common to all citizens of th[e] state." *Id.* Serving "purely local" concerns does not count. *Id.* Examples of state-level government concerns include "police, public education, corrections, tax collection, and public highways." *Id.* Second, BADD must demonstrate that it serves a function that is itself "integral" to addressing that state-level government

concern. *Id.* at 101 (examining whether the airport board's function was itself "integral to state government"). To be "integral" BADD's actions must be necessary, an "essential" part of carrying out that state-level government function. *Commonwealth v. Ky. Retirement Sys.*, 396 S.W.3d 833, 837–38 (Ky. Apr. 25, 2013); *see also Comair*, 295 S.W.3d at 99 (explaining that the test extends sovereign immunity "to departments, boards or agencies that are such integral parts of state government as to *come within regular patterns of administrative organization and structure*" (emphasis added) (quoting *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 331 (Ky.1990))).

Based on the evidence it presents, BADD does not meet either element. First, BADD's evidence does not establish that BADD predominantly serves state-level concerns. If anything, the evidence suggests that BADD's primary focus is on local concerns. Second, BADD's evidence shows that its activities are not integral to state government. BADD may help those that are actually performing state-level government functions, but BADD is not a necessary part of those functions.

■ *State–Level Government Concerns:* The Court must determine what interests BADD serves, and decide whether BADD predominantly addresses state-

level government concerns. *See Comair*, 295 S.W.3d at 98 (requiring an assessment of the entity "*as a whole*" (quotation omitted)); *Cloyd*, 332 S.W.3d at 96 (looking at the "balance" of interests area planning commissions serve). BADD fails to show that the balance of its activities serve state-level concerns. None of the evidence indicates that BADD predominantly serves state-level government concerns. And when the Court draws all reasonable inferences from the evidence in favor of the nonmoving parties, the evidence suggests that BADD predominantly serves local-level government interests. The Court therefore cannot say that BADD carries its summary judgment burden on the second step of the *Comair* test.

■ BADD's evidence shows that it serves a mix of state- and local-level concerns, but provides no way for the Court to tell where the ultimate balance lies. Take the list of activities in the affidavit from BADD's Executive Director, Leonard Stoltz.[6] First, Stoltz explains that BADD assists both county and municipal governments. R. 70–4 at 2 ¶ 3;[7] Municipal governments generally do not address state-level concerns, so BADD's work with municipal governments is not geared towards state-level concerns. *See Cloyd*, 332 S.W.3d at 96 (distinguishing between "the work of a state" and the work of a city);

---

6. In full, Stoltz's affidavit states: "Development districts assist local governmental agencies within their areas, both municipal and county, on planning issues, economic development, environmental, transportation, security, public utilities and other community interests. They consult and advise local county and municipal governments with land use planning, water and sewer infrastructure planning, planning and construction of recreational facilities, the efficient management of fire and law enforcement departments, and the administration of federal funds and programs." R. 70–4 at 2 ¶ 3.

7. BADD also attached a new affidavit from Public Administration Specialist Robert Cash-

er to its reply brief. R. 77–1. Casher's affidavit does not respond to any issues raised in the response briefs, and BADD offers no reason why it did not submit the affidavit along with its opening brief. The affidavit is thus untimely and the Court need not consider it. *See Mulberry Phosphates, Inc. v. City of Toledo*, 125 F.3d 856 (6th Cir.1997). Even if the Court did consider the affidavit, it would have no effect on the outcome. The affidavit simply lists a few concrete examples that fit within the general categories of activities listed in Stoltz's affidavit. *Compare* R. 77–1, *with* R. 70–4 at 1–2.

*Comair*, 295 S.W.3d at 95, 99–100 (holding that cities do not have outright immunity and explaining that cities "tend to exercise proprietary functions addressing purely local concerns"). So which level of government does BADD predominantly assist, county or municipal? The evidence offers no indication either way. Second, Stoltz lists twelve issues that BADD assists, consults, or advises local governments with— but does not indicate which issues BADD focuses on. *See* R. 70–4 at 2 ¶ 3. Some of these issues are state-level concerns, but many are not. *See id.* (listing economic development, land use planning, planning and constructing recreational facilities, public utilities, and "community interests"); *see also Clemmer v. Rowan Water, Inc.*, No. 0:04–cv–165–HRW, 2006 WL 449266, at *3 (E.D.Ky. Feb.23, 2006) (holding that public utilities do not have state sovereign immunity and collecting cases); *Cloyd*, 332 S.W.3d at 96 (explaining that programs that predominantly benefit local property owners, business owners, and residents are "quintessentially" local concerns).

When the Court draws reasonable inferences in the nonmoving parties' favor, as it must at the summary judgment stage, the evidence suggests that BADD's primary function is to serve local concerns. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (requiring courts to draw all reasonable inferences in favor of nonmoving parties).

Stoltz explains that BADD's mission statement "is to: Enhance the economy of our communities through planning, to maximize resources, [to establish] projects to promote development, [and to establish] programs to improve the quality of life for the citizens of the regions." *Id.* at 2 ¶ 3 (alterations in original). Those are not state-level government concerns. Enhancing the local economy certainly is not. *See Berns*, 801 S.W.2d at 331 (holding that promoting the "economic welfare" of two counties was not a state-level government concern); *Cloyd*, 332 S.W.3d at 96 (holding that an entity serves a "local interest" where its actions primarily benefit that locality's businesses and residents). Promoting local development and establishing local programs are both "quintessentially the type of local concern that simply is not common to all citizens of the state." *Cloyd*, 332 S.W.3d at 96.[8] And it is unclear what BADD's mission to "maximize resources" refers to. R. 70–4 at 2 ¶ 3.

The mission statement included in Stoltz's affidavit turns BADD's own evidence against it. A mission statement crystallizes an organization's activities, defining its core values and primary focus. Since BADD's mission statement places local interests at the top of BADD's agenda, the reasonable inference to draw from Stoltz's affidavit is that BADD primarily serves local interests, not state-level concerns.[9]

---

**8.** While *Cloyd* did ultimately find that area planning commissions are immune despite serving some local interests, *see* 295 S.W.3d at 96–97, the Court explains in the next subsection why *Cloyd*'s outcome does not control here.

**9.** BADD also attaches several dozen pages of literature taken from a self-published overview and its 2012 Annual Report. *See* R. 70–4 at 5–36; R. 70–5; *see also* R. 70–4 at 2 ¶ 4 (explaining the sources of the attached literature). BADD's brief does not cite to any facts presented in this literature. Instead, it refers generally to Stoltz's affidavit three times. *See* R. 70–1 at 6–8. The Court's own review of the attached literature revealed no facts that clearly support BADD's motion, only vague descriptions of BADD's activities. If the evidence contained in this literature is not important enough for BADD to cite it as evidence supporting specific arguments in its brief, then the Court will not attempt to summarize and analyze that portion of the record here. *See* Fed.R.Civ.P. 56(c)(3) ("The court need consider only the cited materials . . . ."); *cf. Emerson v. Novartis Pharmaceuticals Corp.*, 446 Fed.Appx. 733, 736 (6th Cir.2011)

Thus, BADD has not satisfied the state-level-concern element of *Comair*'s second step. BADD's evidence does not establish that, on balance, its activities serve state-level government interests. And the most reasonable inference, based on BADD's own mission statement, is that BADD primarily serves local interests. BADD is therefore not entitled to summary judgment based on its alleged sovereign immunity.

■ **Integral Function in State Government:** When Kentucky courts have granted an entity sovereign immunity, that entity played an essential role in addressing a state-level government concern. In *Comair*, the state-level government concern was providing transportation infrastructure, and the airport board was essential to addressing that concern because it physically provided and maintained the airport necessary for air transportation. *See* 295 S.W.3d at 100–02. In *McCord*, the state-level concern was providing "clean water, sanitation, and a functioning sewer system," and the sanitation district was the only entity providing them to the area. —— F.Supp.2d at ——, 2013 WL 275602, at *3 (citing *Wilson v. City of Central City*, 372 S.W.3d 863 (Ky.2012)). Without these entities, the state-level concern would not have been fully addressed. Without the airport board, no governmental entity would maintain the infrastructure needed for air transportation. Without the sanitation district, no governmental entity would ensure that residents received clean water, sanitation services, and a functioning sewer system. The entities thus served a truly integral function—the state-level government concern would not be fully addressed without them.

BADD, on the other hand, is not integral to a state-level function. Stoltz's affidavit explains that BADD assists, consults, and advises local governments and governmental agencies on various issues. *See* R. 70–4 at 2 ¶ 3. Similarly, BADD asserts that it "assist[s] local governments on economic development, transportation, security, public utilities planning, infrastructure planning, management of fire and law enforcement departments, and administration of federal funding." R. 70–1 at 6. But BADD does not develop transportation infrastructure, or maintain water and sewer infrastructure, or carry out law enforcement activities. It merely gives advice about how to perform those functions. Providing nonessential assistance or advice to those who are actually carrying out government functions is not the same as carrying out a government function. And the latter is what the doctrine requires. After all, the animating principle of the sovereign immunity doctrine is that "it is not a tort for government to govern." *Comair*, 295 S.W.3d at 94 (quoting *Dalehite v. United States*, 346 U.S. 15, 57, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (Jackson, J., dissenting)). If an entity is not actually governing, then it should not receive sovereign immunity. And none of BADD's evidence suggests that it is actually governing. Simply put, BADD does not demonstrate that its assistance, consultation, or advice is an integral part of addressing state-level governmental concerns in the way that the airport board in *Comair* or the sanitation district in *McCord* were.

BADD relies heavily on the Kentucky Court of Appeals' decision in *Northern Area Planning Commission v. Cloyd*. *See* R. 70–1 at 7–8; R. 77 at 4–5.[10] In *Cloyd*,

("Judges are not like pigs, hunting for truffles that might be buried in the record." (alterations and internal quotation marks omitted)).

**10.** Since *Cloyd* is a Kentucky Court of Appeals decision, it is not binding on a federal district court's decision. *See Kepley v. Lanz*, 715 F.3d 969, 972–73 (6th Cir.2013). The Court may use it as persuasive data to guide its decision, but must base its decision on how it anticipates the Kentucky Supreme Court would rule on this specific issue. *Id.*

the court held that an area planning commission was entitled to sovereign immunity. 332 S.W.3d at 96. Planning commissions are created by state statute and are responsible for individual counties. *See* Ky.Rev.Stat. § 100.137. Their duties include advising city and county legislative bodies on land-use planning and zoning regulations, providing licensing and inspection services, and collecting taxes. *Cloyd,* 332 S.W.3d at 93, 95–96. *Cloyd* emphasized the first two functions in finding that the planning commission was entitled to sovereign immunity. The court found that the planning commission's licensing and inspection of buildings were clearly integral functions of state government because those activities protect public safety, which "is a concern of the Commonwealth and the source of the state's power." *Id.* at 96. The planning commission's advice to cities and counties on land-use planning and zoning regulations was a closer call. The court admitted that "land use planning and zoning are primarily of local interest" because they address the concerns of local property owners, business owners, and residents. *Id.* However, the court emphasized that the planning commission was contributing to legislative and quasi-legislative functions that were themselves covered by sovereign immunity. *See id.* at 95–96 ("This is important because even cities have immunity in performing legislative or quasi-legislative functions."). The court then pointed out that state law "imposed specific responsibilities" on planning commissions to help ensure that local governments' legislation was in "compliance with state laws which govern how cities may develop." *Id.* at 96. The court thus concluded that while planning commissions' advice might further local interests, they simultaneously served a "significant state interest." *Id.* So after assessing the balance of the area planning commission's functions, the court determined that it pre-

dominantly served state-level government interests. *Id.*

BADD seizes on *Cloyd*'s determination that the planning commission's "recommendations to cities and counties in creating local zoning ordinances" were an integral state government function. R. 77 at 4. If a planning commission's recommendations to city and county legislators qualified as an integral state government function, BADD argues, so should BADD's advice to local governments on various legislative issues. *Id.* But BADD overlooks two crucial aspects of *Cloyd* that distinguish it from this case. First, the primary reason the planning commission received immunity was that it served another integral function—building licensing and inspection. The planning commission's role advising local governments on land-use and zoning issues hindered its immunity claim more than it helped. Second, the planning commission's advice was, by operation of state law, an essential component of the process of zoning and land use legislation.

*Cloyd* was very clear that the planning commission's licensing and inspection activities "weigh[ed] strongly in favor of granting governmental immunity." 332 S.W.3d at 96. Indeed, the planning commission's licensing and inspection services were an essential part of serving the state-level concern of protecting the public safety. *Id.* Without the planning commission ensuring that local buildings complied with governing regulations, no governmental entity would ensure that buildings were not a threat to public safety. If anything, *Cloyd* granted the planning commission immunity despite its advising role in local land-use planning and zoning. *See id.* ("To a substantial degree, land use planning is quintessentially the type of local concern that simply is not common to all citizens of the state."); *see also id.*

("[A]rea planning commissions protect certain interests of the state, but also govern the development of local communities."). So BADD's heavy emphasis on its advising role to local governments is misplaced. That is especially so given that BADD serves no function that is essential in the way that either the planning commission's licensing and inspection services or the airport board's infrastructure maintenance were.

What's more, the advising role BADD plays is nothing like the state-mandated advising role the planning commission played in *Cloyd*. State law mandates that legislators consider a planning commission's recommendations when drafting or amending zoning laws. *See Cloyd*, 332 S.W.3d at 95–96 (citing, *inter alia, City of Lakeside Park v. Quinn*, 672 S.W.2d 666 (Ky.1984) (explaining that state law mandates that cities and counties consider and address planning commission recommendations before legislating on land use or zoning issues)). So cities and counties cannot enact or amend zoning laws until they have received a recommendation from the planning commission. For example, a city or county cannot amend its zoning map until the planning commission has held a hearing, made findings of fact, and prepared a recommendation on the proposed amendment. *See* Ky.Rev.Stat. § 100.211(1). That recommendation will be final and effective unless the legislative body or fiscal court[11] overrides the planning commission's recommendation. *Id.* Similarly, cities and counties cannot amend the text of any zoning laws until the planning commission had held a public hearing on the proposed amendment and submitted a recommendation to the legislative authority. *Id.* § 100.211(2). Thus, state law makes planning commissions an essential part of the legislative process for land use and zoning because the codified legislative process literally requires their advice.

There is no such requirement for BADD's recommendations. While state statute does authorize area development districts to develop plans for various issues within their respective areas, it does not integrate those proposals into any governing processes. *See id.* § 147A.090. Thus, BADD is not integral to the legislative process or any other government function.

Accordingly, BADD has not satisfied the integral-to-state-government element of *Comair*'s second step and is not entitled to sovereign immunity.

■ ***Administering Federal Funding:*** BADD emphasizes the fact that it is statutorily authorized to seek and then distribute funds from the federal government. *See* R. 70–1 at 6. Specifically, BADD is authorized to "[a]ccept, receive, and administer loans, grants, or other funds or gifts from public and private agencies including the Commonwealth and the federal government for the purpose of carrying out the functions of the district." Ky.Rev. Stat. § 147A.080(6). According to BADD, this statutory authority makes BADD a "direct arm" of the state for administering federal programs such as the BLUE program. R. 70–1 at 6. This argument fails to persuade.

A statutory provision authorizing a governmental entity to pursue sources of funding for carrying out its projects—without more—does not entitle that entity to sovereign immunity. What matters most is the ultimate function an entity's funding power serves. For example, in *Berns* the state legislature authorized the Kentucky Center for the Arts to issue revenue bonds to help finance its projects. *See Berns*, 801 S.W.2d at 330. Yet the *Berns* court still held that the Center was

11. A fiscal court acts as the county legislature. *See* Ky.Rev.Stat. §§ 67.080, 67.083.

not entitled to immunity because the Center used its funding power to further functions that were not an integral part of state government. *See id.* at 331; *see also Comair*, 295 S.W.3d at 101 (noting that the airport board was statutorily designated as "a legislative body" when issuing bonds to fund its projects, but focusing on its ultimate function of providing air transportation infrastructure). Such is the case here. The statute that BADD relies on specifically provides that area development districts may pursue federal and other funding in order to "carry[ ] out the functions of the district." Ky. Rev. State. § 147A.080(6). There is no mention of state-level functions. And as explained above, Stoltz's affidavit suggests that the balance of the district's functions serve local interests, not state-level government concerns.

So, BADD is essentially an autonomous entity that pursues federal funding when it determines that doing so will serve local needs. Conversely, in *Comair* the airport board's funding power was expressly limited to its specific functions that addressed a state-level concern: establishing, maintaining, operating, and expanding suitable airport and air navigation facilities. *See* 295 S.W.3d at 101; *see also id.* (explaining that a state statute authorized the board to issue bonds in order to construct, maintain, expand, finance, or improve airport or air navigation facilities). Since BADD's power to pursue federal funding is not similarly tied to any such state-level concerns, that power does not justify granting BADD sovereign immunity.

An examination of the BLUE Program itself shows why BADD cannot receive state sovereign immunity simply because it is authorized to administer federal funding. The purpose of the BLUE Program is to give low-income and disadvantaged youths in the Bluegrass District the chance to gain work experience. *See*

*Stanford*, 399 S.W.3d at 28–29. Under Kentucky precedent, creating local economic opportunities is not a state-level government concern. *See Berns*, 801 S.W.2d at 331 (holding that "promoting tourism and thus the economic welfare" within two counties is not a state-level government concern); *Cloyd*, 332 S.W.3d at 96 (holding that an entity serves a "local interest" where its actions primarily benefit that locality's businesses and residents). So the BLUE Program itself does not qualify for sovereign immunity under *Comair*. *See* 295 S.W.3d at 98–99 (holding that "purely local" concerns do not qualify for sovereign immunity). Thus, BADD's argument based on its funding powers fails to address the question at the heart of the *Comair* analysis: whether the entity at issue carries out state-level governmental functions.

Finally, BADD asserts that if a conventional state agency (such as the Cabinet for Economic Development) were running the BLUE Program, "it could not be disputed that such agency would enjoy sovereign immunity." R. 70–1 at 6. That might well be so. But the point is irrelevant. A bona fide state government agency is entitled to sovereign immunity simply because it is part of the state government—there is no need to apply a functional analysis. *See Comair*, 295 S.W.3d at 94; *see also Calvert Invs., Inc. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 805 S.W.2d 133, 139 (Ky.1991) (holding that the Natural Resources Environmental Protection Cabinet was protected by sovereign immunity because it "is an arm of state government"). *Comair's* two-step analysis comes into play only "when dealing with governmental and quasi-governmental entities and departments *below the level of the Commonwealth itself.*" 295 S.W.3d at 94 (emphasis added). Because BADD falls outside the "taxonomy of city versus state and county," it must satisfy *Comair's* two-step test.

*Id.* at 95. And since BADD does not, it cannot receive sovereign immunity.

## II. BADD's Motion for Summary Judgment for Failure to State Claims

Since BADD is not entitled to sovereign immunity, it is susceptible to the claims brought by the United States and the Crossclaimants. But BADD has a fallback strategy. In the alternative, BADD asks for a judgment on the pleadings, claiming that neither the United States nor the Crossclaimants have alleged cognizable claims for indemnity or apportionment. *See* R. 70–1 at 11–15. The Court will grant judgment for BADD on the indemnity claims, but not the apportionment claims. None of the parties have a valid indemnity claim because none allege facts that make BADD predominantly liable for the plaintiffs injury. Both the United States and the Crossclaimants do, however, have viable contribution and apportionment claims against BADD.

### A. Standard of Review

The Court reviews BADD's motion for judgment on the pleadings [12] under the same standard as a motion to dismiss. *See Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295 (6th Cir.2008). Thus, the Court must assess whether the third-party complaint and the crossclaims allege sufficient facts to establish plausible claims for relief. *See Ashcroft v. Iqbal,* 556 U.S.

662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In assessing a claim's plausibility, the Court must construe the complaint in the nonmoving party's favor,[13] accept all non-conclusory allegations as true, and draw any reasonable inferences in favor of the nonmoving party. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.,* 648 F.3d 452, 456 (6th Cir.2011). The complaint does not have to include "detailed factual allegations." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. The complaint must, however, at least provide the general factual "grounds" entitling the claimant to relief, and not just make "a formulaic recitation of the elements of a cause of action." *Id.* (quotation omitted).

### B. The Difference Between Indemnity, Contribution, and Apportionment

Indemnity, contribution, and apportionment are three related yet distinct concepts in Kentucky law. Distinguishing the three doctrines before examining the parties' claims helps explain why BADD deserves judgment on some claims but not others. All three doctrines distribute responsibility for damages among various defendants based on their relative fault. But the doctrines stem from different sources of law, function in different ways,

---

12. Though BADD does not specifically cite Federal Rule of Civil Procedure 12(c) in its brief, the Court authorized BADD to bring a motion for judgment on the pleadings at the motions conference so the Court assumes that is what BADD is seeking. *See* R. 60.

13. BADD argues against the United States' third-party claims by assuming that all of the allegations in Stanford's complaint are true. *See* R. 70–1 at 12–13. This tactic fails to appreciate the fact that Stanford is not a party to BADD's motion. The Court draws inferences in favor of the nonmoving parties

who are subject to the motion—the United States and the Crossclaimants, not Stanford. *Cf. Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.,* 648 F.3d 452, 456–57 (6th Cir.2011) (drawing all reasonable inferences in favor of the party whose complaint is subject to the motion to dismiss). If the Court had to accept *every* allegation in the underlying plaintiff's complaint as true, then every third-party defendant would win every Rule 12(c) motion on the grounds that the plaintiff's complaint alleged that the defendant was solely responsible for his or her injury.

and apply in different situations. Each came about at a different point in the evolution of Kentucky's law of negligence, yet all three remain in force today in one shape or another.

■ Apportionment is the most modern of the three doctrines, codified by the legislature in 1988. Ky.Rev.Stat. § 411.182; *see also Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 779 (Ky. 2000) (explaining that apportionment grew out of the doctrine of contribution and was eventually codified by the legislature). As its name implies, apportionment spreads the liability for a plaintiffs claims among the tortfeasors based on their relative fault. *See Degener*, 27 S.W.3d at 779. Liability under § 411.182 is several only, so one tortfeasor is never on the hook for the entire amount unless the jury apportions the entire fault to that tortfeasor. *See id.* Since the statute requires the factfinder to assign a "percentage of fault" to all the parties to a claim, codefendants do not need to raise crossclaims for apportionment. Ky.Rev.Stat. § 411.182(1)(b); *see Sommerkamp v. Linton*, 114 S.W.3d 811, 817 (Ky.2003) ("This statute renders a cross-claim for contribution, as well as a counterclaim for contributory or comparative negligence, needless.").[14] But where a party is not named as a defendant in the original complaint, a named defendant can bring a third-party complaint against the unnamed party to ensure that a share of the total liability is apportioned to them. *See Degener*, 27 S.W.3d at 779.

■ Contribution is also a statutory right, originally enacted in 1926, long before Kentucky had adopted the doctrines of comparative negligence or joint and several liability. Ky.Rev.Stat. § 412.030; *De-gener*, 27 S.W.3d at 778–79. The right applies "among wrongdoers [and] may be enforced where the wrong is a mere act of negligence and involves no moral turpitude." *Degener*, 27 S.W.3d at 779 (quotation omitted). Contribution allows Tortfeasor A to bring a contribution action against Tortfeasor B as either a complaint in a separate action, a crossclaim, or a third-party complaint. *Id.* The contribution remedy is limited, allowing Tortfeasor A to seek payment from joint tortfeasors for a proportional share of the amount of the plaintiff's judgment against Tortfeasor A. *See id.* If Tortfeasor B is the only other joint tortfeasor, then Tortfeasor B will owe Tortfeasor A half the amount of the judgment. *Id.* If Tortfeasor B and Tortfeasor C are both joint tortfeasors, they will each owe Tortfeasor A one-third the amount of the judgment. And so on.

■ Contribution applies only where the parties share "equal fault" for the plaintiff's injury. *See Brown Hotel Co. v. Pittsburgh Fuel Co.*, 311 Ky. 396, 224 S.W.2d 165, 166 (1949). The Latin phrase Kentucky courts use as shorthand to refer to equal fault is *in pari delicto*. *See id.; see also Black's Law Dictionary* (9th ed. 2009) (Westlaw) (explaining that the Latin phrase translates to "in equal fault"). The doctrine does not require that tortfeasors be literal 50/50 partners in the plaintiff's injury. Parties are *in pari delicto* where they are "guilty of concurrent negligence of substantially the same character, which converges to cause the plaintiff's damages." *Degener*, 27 S.W.3d at 778.

■ Indemnity is the oldest of the three doctrines, and the only cause of action based on a common-law right. *See*

---

**14.** The Kentucky Courts do not appear to have addressed how a third-party plaintiff's contribution claim and § 412.030's apportionment requirement will interact when: (1) the third-party plaintiff brings an entirely new party into the action and (2) the underlying plaintiff does not bring a claim against the new third-party defendant. The Court withholds any judgment on this issue at this time.

*Union Carbide Corp. v. Sweco, Inc.,* 610 S.W.2d 932, 934 (Ky.Ct.App.1980) (explaining that "indemnity is a jural right which existed prior to the adoption of our Constitution and may not be abolished by the General Assembly"). Since the right precedes the creation of several liability, it does not divide liability up among the parties. *See Degener,* 27 S.W.3d at 780–81. Rather, it is a right of "total indemnity." *Lexington Country Club v. Stevenson,* 390 S.W.2d 137, 143 (Ky.1965) (emphasis omitted); *see also Degener,* 27 S.W.3d at 780 (describing indemnity as a right to be compensated for "any loss" the secondary tortfeasor experiences (quotation omitted)). Because indemnity holds a tortfeasor liable for all of the plaintiff's damages, the party claiming indemnity must show that this strong remedy is warranted. So Tortfeasor A can only succeed on an indemnity claim against Tortfeasor B if Tortfeasor B was "the active wrongdoer or primarily negligent" while Tortfeasor A was "only constructively or secondarily liable" to the plaintiff. *Degener,* 27 S.W.3d at 780–81 (quotation omitted).

## C. The Indemnity Claim and Cross-claims

 Neither the United States nor the Crossclaimants assert proper indemnity claims against BADD. An indemnity claim must allege one tortfeasor's negligence is different in kind—categorically worse—than the other tortfeasor's. Neither the third-party complaint nor the crossclaims make that kind of allegation.

 There are two recognized general categories of indemnity claims under Kentucky law. The first alleges that Tortfeasor A was only constructively or technically liable, while Tortfeasor B was the active wrongdoer. *Degener,* 27 S.W.3d at 780. The most common example would be an employer who is liable for an employee's action under respondeat superior.

*See id.* The second category alleges that Tortfeasor A was only secondarily liable, while Tortfeasor B was the "primary and efficient cause of the injury." *Id.* (quotation omitted). This category usually arises where the primary tortfeasor created the hazard, while the secondary tortfeasor simply failed to perform some legal duty, such as inspection or remedying a hazard. *Brown Hotel,* 224 S.W.2d at 167. In the most famous Kentucky case, a pedestrian was injured when he fell into a manhole. *Id.* at 166. He fell because the manhole had not been properly secured after a fuel company had made a coal delivery to the hotel. *Id.* at 167. The court held that the hotel, which was liable for failing to check that the manhole lid had been properly secured after the delivery, had a claim for total indemnity against the coal company, whose employee had failed to replace the manhole lid property. *Id.* The court stressed that it was the coal employee's negligence that exposed the hotel to liability. *Id.* Thus, a proper indemnity claim must allege that one tortfeasor deserves all or nearly all the blame for the plaintiff's injury.

Neither the United States nor the Crossclaimants allege facts that would make BADD's fault for Stanford's injury categorically greater than their own liability. To be sure, the United States claims that BADD's negligence was "a direct and proximate cause" of Stanford's injury. R. 23 at 9 ¶ 29. But a conclusory allegation is not enough. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). And none of the facts in the third-party complaint support an inference that BADD's negligence was the primary source of Stanford's injury. They might support a conclusion that BADD has a greater degree of fault than the United States, but that is not enough for an indemnity claim. *See ISP Chems., LLC v.*

*Dutchland, Inc.*, 771 F.Supp.2d 747, 751 (W.D.Ky.2011) (illustrating that allegations of different degrees of fault, which can be dealt with through apportionment, are not necessarily indemnity claims). The Crossclaimants' allegations fair even worse than the United States'. Not only do their allegations have less factual detail, they are even more conclusory in stating their legal claim. The Crossclaimants simply assert, without more, that they "should be indemnified or reimbursed by ... BADD for any damages that may be assessed against [the Crossclaimants] in favor· of Stanford." R. 43 at 10; R. 44 at 10; R. 45 at 11. That is not enough to survive a motion for judgment on the pleadings.

The United States warns the Court against focusing too much on placing claims into categories such as "active/passive" or "primary/secondary." R. 74 at 12 (quoting *Crime Fighters Patrol v. Hiles*, 740 S.W.2d 936, 938 (Ky.1987)). The Court's decision does not rest on any particular labels; instead, it rests on the substantive distinction between indemnity and contribution claims. Kentucky law is very clear that indemnity claims are qualitatively different than contribution claims. Because indemnity assigns complete liability for the judgment to one tortfeasor, indem-

nity claims must go beyond claiming that the other tortfeasor shares some of the fault. An indemnity claim must allege that the other tortfeasor's fault is so great that the parties are not *in pari delicto*. *See Crime Fighters Patrol*, 740 S.W.2d at 939–40; *see also Degener*, 27 S.W.3d at 780–81 (stressing that indemnity claims totally indemnify one party and thus must meaningfully distinguish the tortfeasor's respectively liabilities).[15] Otherwise, there is nothing to distinguish indemnity from contribution. And none of the facts alleged by the United States' suggests that BADD's fault is so different that it should totally indemnify the United States. *See ISP Chems.*, 771 F.Supp.2d at 751.

Thus, the Court will grant judgment for BADD on the indemnity claims in the United States' third-party complaint and the Crossclaimants' crossclaims.[16]

## D. The Contribution Claim and Crossclaims

BADD apparently overlooked the fact that both the United States and the Crossclaimants have brought contribution claims against BADD. *See* R. 23 at 13–14 ¶ 52 (claiming "entitle[ment] to apportionment and/or contribution"); R. 43 at 10; R. 44 at 9–10; R. 45 at 11. Contribution re-

---

15. *Crime Fighters Patrol* also stands for the inverse proposition that the United States claims. There, the trial court awarded summary judgment *granting* the indemnity claim, not dismissing it. 740 S.W.2d at 937. So the opinion's warnings apply to awarding an indemnity claims simply because the parties' respective faults fit into categories such as active/passive. *See id.* at 939–41. The decision does not alter the principle that indemnity claims must involve some allegation that makes one tortfeasor's action qualitatively worse than the other.

16. The United States announces its intent to request leave to amend its third-party complaint if the Court finds its claims are deficient. *See* R. 74 at 13 n. 6. Since all parties have until August 19, 2013 to file such a

motion, *see* R. 71 at 5 ¶ 1, the United States is certainly free to do so. However, because a judgment on the pleadings is a judgment on the merits, the United States will first have to make a motion to reopen the Court's judgment. *See Weeks v. Bayer*, 246 F.3d 1231, 1236–37 (9th Cir.2001) (holding that, where judgment has been entered on a complaint under Fed.R.Civ.P. 12(c), the plaintiffs must move to reopen that judgment under Fed. R.Civ.P. 59(e) before the district court can entertain a motion to amend); *see also Nw. Nat. Ins. Co. of Milwaukee v. Joslyn*, 53 F.3d 331, 1995 WL 270995, *5–6 (6th Cir.1995) (unpublished table decision) (identifying the factors courts consider when a party moves the district court to conditionally amend its judgment and permit the party to file an amended complaint).

mains a viable cause of action under Kentucky Revised Statute § 412.030. *See Degener*, 27 S.W.3d at 779 (explaining that defendants may bring third-party complaints for contribution via Kentucky Civil Rule 14.01); *see also CSX Transp., Inc. v. Gen. Elec. Co.*, No. 3:09–cv–407, 2009 WL 3254879, at *4 (W.D.Ky. Oct. 8, 2009) ("[T]he case law provides a sufficient background to find that a claim for contribution is permissible...."). The United States and the Crossclaimants' contribution claims thus survive BADD's motion.

### E. Apportionment

■ Stanford did not assert any claims against BADD in his underlying complaint; the United States impleaded BADD into this action. BADD jumps on this fact. BADD argues that the United States and the Crossclaimants cannot maintain their apportionment claims against BADD because there is no substantive cause of action for apportionment under Kentucky law. While there is no independent cause of action for apportionment, both the United States and the Crossclaimants are still entitled to have fault apportioned among themselves and BADD.

First, BADD's argument wrongly presumes that the United States and the Crossclaimants have no other substantive cause of action. The decision that BADD relies on addressed a third-party complaint seeking only apportionment under Kentucky Revised Statute § 411.182, not contribution under § 412.030. *See Texas Capital Bank, N.A. v. First Am. Title Ins. Co.*, No. 3:09–cv–661–JGH, 2012 WL 443460, at *1 (W.D.Ky. Feb. 10, 2012) (addressing a "third-party complaint plead[ing] a single cause of action for allocation of fault under

Ky.Rev.Stat. § 411.182"); *see also* R. 70 at 14–15 (citing *Texas Capital Bank*). But since the contribution claims are still viable, they provide a substantive cause of action to support the United States' third-party complaint and the Crossclaimants' crossclaims regardless of whether apportionment is itself a cause of action. Thus, the apportionment claims still have a legal leg to stand on.

Second, fault should still be apportioned to BADD because the United States' third-party complaint made BADD a "party to the action" under Kentucky Revised Statute § 411.182. Section 411.182 applies to tort cases and requires the jury to apportion fault in cases where there is "more than one (1) party to the action, including third party defendants." Ky.Rev.Stat. § 411.182(1). The Sixth Circuit has held that third-party defendants are parties to the action under § 411.182 once a defendant impleads them through a third-party complaint. *See Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 228 (1997), *abrogated on other grounds by Ortiz v. Jordan*, —— U.S. ——, ——, 131 S.Ct. 884, 889, 178 L.Ed.2d 703 (2011). In *Adam*, the defendants impleaded various third-party defendants through a third-party complaint. *Id.* at 222. The Court of Appeals declared that the third-party defendants "clearly had been sued" when they were impleaded by the defendants. *Id.* at 228. The Sixth Circuit went on to hold that third-party defendants who are impleaded by defendants are "just as much 'part[ies] to the action,' within the meaning of Ky.Rev.Stat. 411.182 as any original party was." *Id.* Thus, fault must be apportioned to BADD should this case proceed to trial.[17]

---

17. Of course, if BADD is able to win summary judgment on the United States and the Crossclaimants' claims against it prior to trial, then the United States and the Crossclaimants will only receive a jury instruction for apportion-

ing fault against BADD. *See Adam*, 130 F.3d at 222, 227–30. And the jury instruction for apportionment, standing alone, does not make BADD liable for any fault apportioned to it. *See id.* at 228–30. Since BADD's brief

The Kentucky Supreme Court's decisions support *Adam*'s conclusion that defendants in the United States' position can implead third-party defendants like BADD. *Degener* explains that § 411.182 assigns each defendant "a specific share of the total liability to each [defendant], *whether joined in the original complaint or by third-party complaint.*'" 27 S.W.3d at 779 (emphasis added). And the court implicitly endorsed this practice in *Kentucky Farm Bureau Mutual Insurance Co. v. Ryan*, 177 S.W.3d 797, 799, 804 (Ky.2005) (allowing defendant insurance company to bring a third-party motorcyclist into the suit through a third-party complaint, even though the motorcyclist was not named in the original complaint).

Finally, BADD argues that apportionment is improper because BADD was not *in pari delicto* with the United States or the Crossclaimants. *See* R. 70–1 at 14. Not so. First, the doctrine of apportionment does not require the parties to be *in pari delicto*. *See Degener*, 27 S.W.3d at 779. In fact, the concept of assigning tortfeasors varying percentages of fault necessarily embraces the possibility that the tortfeasor's respective liability could be something other than 50/50. So BADD's argument is irrelevant.

Second, BADD's argument misunderstands the principle of *in pari delicto*. BADD asserts that it was not *in pari delicto* because it was not "acting jointly with the United States, the Cadet Corps, or any of its officers of employees at the time of the Plaintiffs injury." R. 70–1 at 15. The principle of *in pari delicto*, however, does not require parties to act in cooperation with each other. *See, e.g., Campbellsville Lumber Co. v. Lawrence*, 268 S.W.2d 655, 656 (Ky.1954) (affirming a contribution claim where the complaint alleged that both drivers' negligence contrib-

uted to the accident). All the United States and the Crossclaimants need to allege is that BADD is "guilty of concurrent negligence of substantially the same character which converges to cause the plaintiff's damages." *Degener*, 27 S.W.3d at 778. And they do.

■ As BADD itself admits, the factual allegations in the third-party complaint and the crossclaims could support a finding that BADD is liable for its "passive negligence." R. 70–1 at 13. That alleged "passive negligence" is substantially similar to the negligence the United States and the Crossclaimants stand accused of here—especially given that that there has not yet been any discovery in this case. *See Crime Fighters Patrol*, 740 S.W.2d at 940 (warning that the particular factual circumstances of the case will often determine whether the parties are *in pari delicto*). For example, the United States alleges that BADD failed to take the proper steps to train or supervise Stanford. *See* R. 23 at 8–9 ¶¶ 26–29. That alleged "passive negligence" is substantially similar to Stanford's allegations that the United States failed to take certain steps to warn that the zip line was not ready for use. *See* R. 1 at 5–8 ¶¶ 39–70. Depending on the details that come out in discovery, a jury could very well find that the United States and BADD are *in pari delicto*. *See Crime Fighters Patrol*, 740 S.W.2d at 940. Thus, BADD's argument that the third-party complaint and the crossclaims fail to allege that the parties are *in pari delicto* fails. At this stage of the case, the United States and the Crossclaimants have stated facially plausible claims for relief. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

### CONCLUSION

Accordingly, it is **ORDERED** as follows:

---

did not directly address the contribution claims against it, the Court reserves judgment

on how those contribution claims interact with § 411.182. *See* Footnote 14 *supra.*

(1) The Bluegrass Area Development District's Motion for Summary Judgment, R. 70, is **GRANTED IN PART** and **DENIED IN PART.**

(2) The Bluegrass Area Development District's motion for summary judgment on sovereign immunity grounds, R. 70–1 at 4–10, is **DENIED.**

(3) The Bluegrass Area Development District's motion for judgment on the pleadings for the United States and the Crossclaimants' common-law indemnity claims, R. 70–1 at 11–14, is **GRANTED.** Pursuant to Federal Rule of Civil Procedure 12(c), **JUDGMENT** for third-party defendant BADD is granted on the following claims:

(a) The United States' claim for common-law indemnity against BADD, R. 23 at 13 ¶ 51;

(b) The United States Army Cadet Corps, Inc.'s claim for indemnity against BADD, R. 43 at 10 ¶ 4;

(c) Joseph M. Land, Sr.'s claim for indemnity against BADD, R. 44 at 10 ¶ 5; and

(d) Joseph H. Gorman's claim for indemnity against BADD, R. 45 at 11 ¶ 5.

(4) The Bluegrass Area Development District's motion for judgment on the pleadings for the United States and the Crossclaimants' apportionment claims, R. 70–1 at 14–15, is **DENIED.**