**Billy MYERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 43170.**

Court of Criminal Appeals of Texas.

Nov. 25, 1970.

**860**

---

Royal Caswell, Odessa, for appellant.

John Green, Dist. Atty., and John Hoestenbach, Jr., Asst. Dist. Atty., Odessa, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is murder with malice; the punishment, 17 years.

The indictment alleged that appellant, on or about the 17th day of August, 1968, did voluntarily and with malice aforethought kill Roy McNeal by shooting him with a gun.

Horace Triggs was the state's first witness. The first testimony elicited from him by the state was that he was 45 years old, that he came to Odessa in 1951 and had been there since, except for the time he was in the penitentiary following his conviction in Ector County for theft and the revocation of his probation and sentence to a term of five years on March 29, 1961, until his release on June 5, 1963.

Triggs testified as an eye witness to the killing of Roy McNeal, a man he had never seen before, by appellant, with whom he had associated and knew "pretty well as a friend."

The testimony of the witness Triggs included the following:

On Saturday morning, August 17, 1968, as he started to go into a pawn shop he noticed a car parked over the curb by a white picket fence in front of the house next door. Appellant Billy Myers drove up, got out of his car and started walking across the street with a shotgun in his hand;

"Q. At that time, Horace, was there somebody else out there besides you and Billy Myers with the shotgun?

"A. I didn't see nobody else.

"Q. Was there somebody that got shot?

"A. The dead man got shot.

"Q. Well, was he there?

"A. Yes, he was there.

"Q. Now, tell the jury where he was with relationship to where that car and that house and picket fence are?

"A. He had done got out of the car and was going inside the gate there, he had reached for the gate like he was going on the inside. I know that is the way I seen it, like he was going on the inside of the house, it looked like.

"Q. What happened?

"A. Then Mr. Billy Myers called him and he turns around, he turns around and when he turns around he said, well, Billy hollared at him and he said, 'Well, man, I know you are going to kill me, go on and get it over with,' and then Billy shot him.

"Q. You are talking about the dead man said to Billy, that is what he said, and did Billy keep on walking towards him?

"A. Billy walked pretty close to him and when he walked pretty close to him he shot him.

"Q. About how far away was he when he shot him?

"A. I will say, a rough guess, I would say ten or twelve feet."

Other testimony offered by the state was that "the immediate cause of death of Roy McNeal was a shotgun wound of the left chest that severely damaged the heart and probably caused death in a very short period of time, almost instantly."

Appellant offered testimony as to threats made by the deceased to kill appellant which were communicated to appellant by Jeanne Myers, and testimony to impeach the witness Triggs.

Also, appellant testified in his own behalf. He admitted having shot the deceased but gave an entirely different version of the shooting. He testified that he did not park on the other side of the street, but parked about 15 or 20 feet from the deceased's car.

"Q. Did you get out of the car then, Mr. Myers?

"A. No, I just stuck my head out the window and asked him what did he want. I said, we don't have any-thing to talk about. So he started walking towards me with his right hand in his pocket and so I told him, I said, don't come up on me with your hand in your pocket like that.

"Q. Was that when you got out of the car?

"A. No, he took about three or four more steps.

"Q. Then did you get out of the car?

"A. Yes, sir, I got out of the car.

"Q. You had the shotgun sitting right there in the front seat?

"A. Yes, sir, on the floor.

"Q. Did he take his hand out of his pocket?

"A. No, he didn't.

"Q. When you got out of the car did you take the shotgun out with you?

"A. Not at first I didn't.

"Q. Were you all the way out of the car?

"A. No, I had the door open and one foot on the ground.

"Q. And you told him not to walk up on you with his hand in his pocket?

"A. That is right.

"Q. Then what did he do?

"A. He took about three or four more steps and then I got out with the gun.

"Q. Then what did Mr. McNeal do?

"A. Well, he stopped and he backed away slow and he started like he was going to the gate and go in the yard, but he didn't, he turned around and his door was open and he put his left hand on the door like that and then, we wasn't saying anything to each other then, I had the gun under my arm like that and he still had his hand in his pocket and he brought his left hand off the door like this and he told me, he said, I will tell you one thing man, if I ever pull a gun on a man I will use it, I goddamn sure mean it, and he started head first into the car like that and I shot him.

"Q. What did you think he was getting in the car for?

"A. Well, he was getting in there to set down, you don't go head first to set in a car."

\*   \*   \*   \*   \*   \*

On cross-examination:

"Q. So he is leaning over to get into this car with this driver's side door open and you are up here?

"A. He wasn't leaning over, he was going to his car like that and that is when I shot him just like that. He wasn't leaning over in his car, no, he was fixing to go into his car like that and that is when I shot him.

"Q. And the door was open?

"A. That is right."

Though she testified that she was on the opposite side of the car, getting her purse, and did not see the shooting, Jeannie Myers corroborated the testimony of appellant as to the threats and incidents leading up to the killing. Also she testified in part that she had been with appellant and he had slapped her two or three times before she left him at the Gay Paree and went home, where the deceased was to pick her up at noon; that she got in the car with Roy and drove out about the Gay Paree. They saw appellant and tried to flag him down but couldn't catch him. Roy "had already told me he was going to kill him (appellant) because when my face was swollen, he was going to kill Billy. If I could have gotten to Billy then I would have told him again, I had told him seventeen times."

When Billy came down from Big Spring that day and they were riding around they were "trying to make up" * * * "we were going to get back together," and she was going to leave Roy.

Ground of error No. 1 relates to jury argument and complains that the court committed material error in refusing to allow counsel for appellant, in argument, to comment upon the motives, interest and bias of Horace Triggs, a witness for the state.

The record reflects excerpts from the jury argument of appellant's counsel relating to the witness Horace Triggs and his testimony. Nowhere in the record do we find any ruling by the trial court such as complained of in ground of error No. 1.

Ground of error No. 2 complains that the court erred in allowing counsel for the state to elicit testimony from the wife of appellant and from appellant regarding offenses committed by appellant prior to the offense in question.

The testimony referred to in the ground of error is stated in the brief to include (1) a statement signed by the common law wife of appellant to the admission of which a bill of exception was approved and filed; (2) the following testimony elicited from Jeannie Myers, the common law wife of appellant, on cross-examination:

"Q. Now, who hit you and beat you up around the face on Saturday, August 17th, 1968?

"A. Is that the same day we are talking about?

"MR. CASWELL: Your Honor, the same objection to this.

"THE COURT: Overruled.

"Q. The same day the dead man got dead.

"A. What did you ask me?

"Q. "Who hit you around the face and bruised your face?

"A. My husband, he slapped me two or three times. That is not anything,"

and (3) the following cross-examination of appellant:

"Q. Whose car were you in?

"A. Elnora Morrison.

"Q. That is the woman you lived with in Big Spring?

"A. That is right.

"MR. CASWELL: The same objection throughout this testimony.

"THE COURT: Overrule the objection.

MR. CASWELL: Can we have a continuing objection?

"THE COURT: Yes, you sure can.

"Q. Whether you say you are married to Jeannie Myers or not, you do live with another woman in Big Spring?

"A. I was at the time."

Assuming that the ground of error complies with the requirements of Art. 40.09(9) Vernon's Ann.C.C.P., and the question of whether the court erred in allowing evidence of extraneous offenses not showing or tending to show intent or scheme is before us, we do not agree that such evidence was so highly prejudicial to appellant as to warrant reversal. Johnson v. State, Tex.Cr.App., 378 S.W.2d 76; Mouton v. State, 155 Tex.Cr.R. 450, 235 S.W.2d 645.

■ Ground of error No. 3 relates to the answer of a prospective juror on voir dire that she was previously with the Ector County Juvenile Department for eleven years and was not sure that she knew the defendant, though his name was "vaguely familiar."

The trial judge instructed the jury panel that despite what the prospective juror said "there is no way she could have known this man."

The contention that the court erred in overruling appellant's motion for mistrial is overruled.

Ground of error No. 4 relates to the fact that some paper matches, such as put out by candidates for office, with the name of John Green, District Attorney, printed on them were found in the men's dormitory, one of which was in possession of a juror who was using them.

■ There is nothing in the record to show how the matches got into the juror's quarters or in possession of the juror, or that the District Attorney's office was in any way responsible for such. The trial court did not err in overruling appellant's motion for mistrial on the ground that favors had been supplied to the jurors by the office of the District Attorney.

Ground of error No. 5 relates to the court's charge and to the refusal of appellant's requested charge on the law of self defense.

Appellant's contention is that the court refused to instruct the jury that the defendant had the right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real.

■ The court's charge included instructions on the law relating to communicated threats and the right of the defendant to act upon the information given him, whether the threats to take his life were made or not, and in connection with the defendant's right of self defense, further instructed the jury that in determining the existence of real or apparent danger, it was the duty of the jury to consider all of the facts and circumstances in the case in evidence before the jury and in considering such circumstances to place themselves in defendant's position and view them from his standpoint alone.

The ground of error further complains that the court erred in refusing to charge that the defendant was in no event bound to retreat in order to avoid the necessity of killing his assailant.

■ The charge on self defense was given by the court in connection with the law of threats. There was no evidence to raise the issue of self defense independent of the statute (Art. 1258, Vernon's Ann. P.C.) applicable where a defendant accused of murder seeks to justify himself on the ground of threats against his own life.

The omission of an instruction that the defendant was not bound to retreat was not called for under the evidence.

The charge given was sufficient to protect any right or justification of the de-

fendant on the ground of threats against his own life.

Ground of error No. 5 is overruled.

■ Ground of error No. 6, which complains that the Judge of another Judicial District qualified the jury and determined excuses is without merit.

■ Ground of error No. 7 presents the contention that appellant's constitutional rights to a trial by jury were violated when the jury was denied any opportunity to recommend probation for him.

No motion for probation was filed.

In his brief appellant argues:

"The practical effect of Section C (Art. 42.12 V.A.C.C.P.) is to require that a defendant, who has been previously convicted of a felony make an unconstitutional election between receiving a term of years from the jury with no right of probation, or to elect to have the Trial Court assess his punishment, in which case the right to probation becomes possible."

The adult probation and parole statute, Art. 42.12 V.A.C.C.P., provides in Section 3a that the jury may recommend probation upon written sworn motion made therefor by the defendant filed before the trial begins, but further provides:

"In no case shall probation be recommended by the jury except when the sworn motion and proof shall show, and the jury shall find in their verdict that the defendant has never before been convicted of a felony in this or any other State."

Section 3 of said Article vests authority in the judges of the courts of Texas having original jurisdiction of criminal cases to grant probation, and Section 3c of said Article provides:

"Nothing herein shall limit the power of the court to grant a probation of sentence regardless of the recommendation of the jury or prior conviction of the defendant."

Ground of error No. 7 is without merit.

Ground of error No. 8 is:

"The Trial Court committed material error by allowing Al Walvoord, the Assistant District Attorney of Ector County, Texas, to act as counsel for the State after the District Attorney, John H. Green, had been relieved of his appointment to represent this defendant and had been appointed as the District Attorney of Ector County, Texas."

A motion to disqualify the staff of the office of the District Attorney of Ector County as counsel for the state, and requesting the appointment of a special prosecutor, filed March 25, 1969, is found in the record. The motion is signed by counsel for appellant and reflects his certification that a copy of the motion had been delivered to John H. Green.

Other than the recitations of the motion and of the appellate briefs of appellant and the state, the record does not reflect that the motion was presented to or acted upon by the court.

The record does reflect that Al Walvoord, Assistant District Attorney, represented the state in prosecuting the case.

■ If, as stated in the state's brief, John H. Green had only one casual conversation with appellant and gained no information from appellant after being appointed to represent him; received no fee and secured no information in confidence in the capacity of appointed counsel, the mere fact of his appointment to represent appellant and his subsequent appointment as District Attorney did not disqualify his assistant, Mr. Walvoord, from prosecuting the case without any assistance from or discussion with Mr. Green.

Ground of error No. 8 is overruled.

The judgment is affirmed.