## KENTUCKY RIVER FOOTHILLS DEVELOPMENT COUNCIL, INC., Appellant

v.

## Cathy PHIRMAN, Administratrix of the Estate of Melissa Steffen; Joanne Gilliam, as Guardian of Conner Keith Gilliam and Carter Ray Gilliam, Unmarried Infants; and Daryll Gilliam, as Guardian of Conner Keith Gilliam And Carter Ray Gilliam, Unmarried Infants, Appellees

2015–SC–000244–DG

Supreme Court of Kentucky.

DECEMBER 15, 2016

COUNSEL FOR APPELLANT: Daniel Barry Stilz, Robert Coleman Stilz III, Adrian M. Mendiondo, Lynn Sowards Zellen, Kinkead & Stilz PLLC

COUNSEL FOR APPELLEES: James T. Gilbert, Coy, Gilbert, Shepherd & Wilson, Douglas Loy Hoots, Landrum & Shouse LLP, Gregory Michael Funfsinn

OPINION OF THE COURT BY JUSTICE KELLER

Kentucky River Foothills Development Council, Inc.[1] (Kentucky River), a commu-

---

1. The appellees originally filed suit against Liberty Place Recovery Center for Women,

nity action agency, filed a motion for summary judgment on the grounds that it is entitled to sovereign immunity. The Madison Circuit Court denied Kentucky River's motion and the Court of Appeals affirmed. We granted discretionary review and, having reviewed the record and the parties' arguments, we affirm the denial of summary judgment but for reasons that differ from those set forth by the circuit court and the Court of Appeals.

## I. BACKGROUND.

For purposes of this appeal, the underlying facts are not in dispute. Melissa Steffen, who suffered from Bipolar Disorder, served time in prison for a drug offense. When she was paroled, Melissa was required to find some type of living arrangement before she could be released. Melissa's mother, Cathy Phirman, located Liberty Place Recovery Center for Women, LLC (Liberty Place), a peer-based substance abuse recovery program administered by Kentucky River, and Melissa put her name on the waiting list. When a bed became available, Melissa was released from prison and accepted at Liberty Place despite having a medical/psychological history that included three suicide attempts and treatment for Bipolar Disorder.

At the time of her admission to Liberty Place, Melissa was taking prescription medication for her Bipolar Disorder. However, during the course of her stay at Liberty Place, Melissa ran out of her medication. As a result, Melissa became increasingly disturbed and, approximately six weeks after her admission, she left the facility. A few hours after Melissa left the

facility, one of Liberty Place's employees saw her on the side of the road. The employee took Melissa to the Salvation Army and spoke with someone to secure a bed for the night for Melissa. However, because the Salvation Army was not yet open for clients, the employee took Melissa to the public library and left her there. When Phirman tried to contact Melissa at Liberty Place, personnel there would not give her any information. Phirman ultimately discovered that Melissa was no longer at Liberty Place, and she filed a missing person's report and searched for Melissa but could not find her.

In October 2010, approximately five months after Melissa left Liberty Place, a person who was taking copper pipe from an abandoned building discovered Melissa's body. The coroner determined that Melissa had committed suicide near the time she left Liberty Place.

Phirman, as administratrix of Melissa's estate, and Joanne and Daryll Gilliam, as guardians of Melissa's two minor sons, filed suit against Liberty Place and Kentucky River. The parties conducted extensive discovery and, on July 22, 2013— approximately six weeks before trial— Kentucky River filed a motion for summary judgment asserting "sovereign immunity."[2] For reasons that are unclear from the record, the court entered two orders denying that motion. Relying on *Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.*, 295 S.W.3d 91 (Ky. 2009), one of the court's orders stated that Kentucky River was not entitled to immunity because it was not the offspring of an entity entitled to immunity and because Kentucky River provides services that oth-

---

LLC. However, they amended their complaint to name Kentucky River, which is the administrative body that operates Liberty Place.

2. We note that Kentucky River also filed a motion for summary judgment asserting that it had no liability and that the plaintiffs had not proven causation. The trial court denied that motion.

er non-governmental entities provide. The other order, also relying on *Comair*, found that Kentucky River failed the "parent' test" because it was not a governmental agency.

Kentucky River appealed to the Court of Appeals. The Court of Appeals, in a divided opinion, affirmed. In doing so, the Court first noted that Kentucky River is neither the Commonwealth nor a county, therefore, it is not entitled to sovereign immunity. The Court then determined that Kentucky River, which was initially formed as a private nonprofit corporation, was not entitled to governmental immunity under *Comair's* parent test because it had not been created by an entity entitled to immunity, *i.e.*, a county. The Court also noted that Kentucky River continues to operate as a private nonprofit entity.

As noted above, Kentucky River sought discretionary review, which we granted to address the issue of governmental immunity.

## II. STANDARD OF REVIEW.

 Whether a defendant is entitled to "immunity is a question of law ... , which we review *de novo.*" *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006), *as corrected* (Sept. 26, 2006)(internal citations omitted).

## III. ANALYSIS.

At the outset, we note that this matter involves services provided by Liberty Place, an entity administered by Kentucky River. It does not involve any other services that Kentucky River may provide. Thus, the issue is whether Kentucky River has immunity with regard to its operation of Liberty Place, and our holding today is limited to that issue. Our holding does not apply to Kentucky River's operations generally or to its operation of any other services.

Kentucky River is a community action agency. The Court of Appeals did a commendable job of summarizing the history of community action agencies and we adopt that summary as our own.

The community action agency concept originated in Title II of the Economic Opportunity Act of 1962 ("the EOA"), 42 U.S.C. 3 §§ 2781–2837 (1976) (repealed 1981). Through the EOA's provisions, Congress sought to encourage the creation of community operated agencies that would coordinate federal, state, and private resources to combat poverty at a local level. *U. S. v. Orleans*, 425 U.S. 807, 818, 96 S.Ct. 1971, 1977, 48 L.Ed.2d 390 (1976). Under the EOA, funding flowed directly from the federal government to community action groups that were properly designated as such by state or local authorities and that complied with federal statutory and administrative requirements. *See Cervantes v. Guerra*, 651 F.2d 974, 975 (5th Cir. 1981). While Congress defined the basic structure and functions of these agencies and established requisites for federal funding, it largely left discretion in administering the programs and funding to the community action groups themselves. *See Gilmore v. Salt Lake Cmty. Action Program*, 710 F.2d 632, 634 (10th Cir. 1983).

In 1981, Congress repealed the community action agency provisions of the EOA and established the Community Services Block Grant Program, ("CSBGP") 42 U.S.C.A. 4 §§ 9901–9912 (1983 & Supp. 1989). *See* 42 U.S.C.A. § 9912(a). The distinguishing feature of the CSBGP was that it shifted the responsibility for running the program from the federal government to the States. *Guilford County Cmty. Action Program, Inc. v. Wilson*, 348 F.Supp.2d 548, 552 (M.D.N.C. 2004). Instead of

giving funds directly to community action agencies, funds to reduce poverty were allocated to the States through block grants. *Id.* "The States would then channel the funding to eligible entities, generally nonprofit community action agencies that specialized in poverty reduction. In turn, those agencies provided funding to individuals and to programs designated to reduce poverty." *Id.*

. . .

In response to the CSBGP, the Commonwealth of Kentucky enacted a set of statutes, KRS 273.405 to 273.453, to govern the establishment and administration of community action agencies. The statutes, which mirror in large part the federal scheme under the EOA, became effective July 15, 1982.

By statute, the Commonwealth mandated that "[t]here shall be established community action agencies throughout political subdivisions of the Commonwealth." KRS 273.405. A "community action agency" is defined as "a corporation organized for the purpose of alleviating poverty within a community or area by developing employment opportunities; by bettering the conditions under which people live, learn, and work; and by conducting, administering, and coordinating similar programs." KRS 273.410 (2).

*Kentucky River Foothills Development Council, Inc. v. Cathy Phirman, et al.,* 2013–CA–001858–MR, 2015 WL 1746483, at *6–8 (Ky. App. April 17, 2015).

Kentucky River was created in 1962 as a private nonprofit corporation. In 1968, Clark County designated Kentucky River as a community action agency for the purpose of receiving Economic Opportunity Act funding from the federal government.

Kentucky River's designation as a community action agency continued through the adoption of KRS 273.405, *et seq.,* and it receives federal funding through the Community Services Block Grant Program.

Ultimately, Kentucky River also became the community action agency for Community Services Block Grant Program purposes for Madison, Estill, and Powell Counties. As a community action agency, Kentucky River administers a number of programs, including Head Start, and programs to provide emergency food, shelter, and energy assistance; housing assistance for the homeless; public transportation; and health care for the uninsured and underinsured homeless citizens in Estill and Powell Counties. Kentucky River's Articles of Incorporation, which were amended in 2002, state, in pertinent part, that Kentucky River:

[I]s organized exclusively for charitable and educational purposes. Said corporation shall be for the benefit of the people of the Commonwealth of Kentucky, including but not limited to the provision of early childhood education for poor and handicapped children, housing for low and moderate income families, economic development, job training, and social services to benefit disadvantaged persons.

As noted above, Kentucky River also administers Liberty Place, which, according to Kentucky River's response to interrogatories:

[I]s not a medical provider and does not have patients. Liberty Place is a long-term substance abuse recovery program for women. Liberty Place uses a recovery program model that includes peer support, daily living skills training, job responsibilities and challenges to practice sober living.[3]

3. We note that Kentucky River's Executive Director stated in her affidavit that Liberty

■ Because it is a community action agency under KRS 273.405, *et seq.*, Kentucky River is required to comply with a number of statutory and regulatory requirements. Those requirements include having a governing board that falls within statutory guidelines; preparing and submitting an annual budget to the Commonwealth's Department for Local Finance; submitting financial statements to the fiscal courts of the counties it serves; and complying with program effectiveness standards promulgated by the Commonwealth. Based on the preceding, Kentucky River argues that it is entitled to the same immunity as the counties it serves. The trial court and the Court of Appeals disagreed, as do we.

> Despite the frequency of opinions on the subject from this Court, the law of sovereign immunity, and the related doctrines of governmental immunity, official immunity, and qualified official immunity, is still difficult to apply, no doubt in part because of the large number of decisions on the subject. Attitudes about the propriety of immunity for the state and its subdivisions, government agencies and their employees, and government-created entities have shifted back and forth over time and personnel changes on the Court.

*Comair*, 295 S.W.3d at 94.

■ In *Comair*, we attempted to clarify this confusion by setting forth a two-prong standard to be used in determining whether an agency has immunity. The first prong deals with the origins of the entity claiming immunity, *i.e.*, "an entity's immunity status depends to some extent on the immunity status of the parent entity." *Id.* at 99. The second and "more important" prong focuses "on whether the entity exercises a governmental function, which . . .

means a 'function integral to state government.' " *Id.* (citing *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327, 332 (Ky. 1990)).

The circuit court and Court of Appeals focused on the first prong, the "parentage" of Kentucky River. Citing to *Marion County v. Rives & McChord*, 133 Ky. 477, 118 S.W. 309 (1909), they both concluded that, by providing services to the poor, Kentucky River was performing a function integral to state government. However, because Kentucky River existed as an independent nonprofit entity before it began operating as a community action agency, they concluded it was not born of immune parents and thus not entitled to immunity. We believe that the issue raised herein does not primarily concern Kentucky River's parentage, but whether Kentucky River, through Liberty Place, is performing an integral state function. Furthermore, because this matter can be resolved by analyzing the integral-state-function prong, we need not address the parentage prong.

■ "The question of whether an entity carries out an integral state function has remained the primary focus of our sovereign immunity analysis since at least the turn of the twentieth century." *Coppage Construction Company, Inc. v. Sanitation District No. 1*, 459 S.W.3d 855, 862 (Ky. 2015). To determine if an entity is performing an integral state function, we must analyze what that entity actually does. *Id.* That analysis has *"two* elements: whether the entity's function is 'governmental' as opposed to proprietary, and whether it is a matter of 'statewide' concern." *Id.* (emphasis in original).

As noted above, community action agencies were created to alleviate poverty. Cer-

---

Place "is one of ten Recovery Kentucky substance abuse recovery centers in the state open to homeless or marginally homeless women dealing with substance abuse issues."

tainly that is a laudable goal, and it may even be integral to a state-at-large function. However, we need not address whether the alleviation of poverty is a legitimate state function that may be performed by a county or counties because Liberty Place is not performing that function. As set forth in its response to interrogatories, "Liberty Place is a long-term substance abuse recovery program for women." By its own admission, the purpose of Liberty Place is to alleviate substance abuse, not to alleviate poverty. Indeed, the key factor necessary to take advantage of Liberty Place's services is addiction, not poverty. The fact that poverty and substance abuse may be and often are related, does not make the primary purpose of Liberty Place the alleviation of poverty. Furthermore, the fact that most if not all of Liberty Place's clients are impoverished does not alter its purpose: alleviation of substance abuse/addiction. Therefore, to the extent that alleviation of poverty is a state function that may be performed by counties, Liberty Place is not performing that function.

Kentucky River, in administering Liberty Place, is not performing the function of a community action agency. As noted above, a community action agency is "a corporation organized for the purpose of alleviating poverty within a community or area by developing employment opportunities; by bettering the conditions under which people live, learn, and work; and by conducting, administering, and coordinating similar programs." KRS 273.410(2). Providing and administering a substance abuse program alleviates substance abuse/addiction, not poverty. In *Coppage*, we determined that storm water management is "not a traditional and necessary state function such as those functions performed by the state police, our public schools, the corrections system, and public highways and airways." 459 S.W.3d at 864.

Likewise, the alleviation of substance abuse/addiction is not a traditional and necessary state function. Rather, it is substantially the same function performed by any number of private businesses involved in the provision of services to those who have fallen prey to substance abuse. *See Breathitt County Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009). Therefore, while Kentucky River may be functioning as a private nonprofit agency by administering Liberty Place, it is not functioning as a community action agency or performing a necessary state function by doing so. Because the preceding resolves the issue before us, we need not address the Estate's argument that Kentucky River waived its right to assert immunity by waiting until nearly the eve of trial to do so.

## IV. CONCLUSION.

Kentucky River is not entitled to immunity with regard to its operation of Liberty House. Therefore, we affirm the circuit court's denial of Kentucky River's motion for summary judgment, and the affirmation of that denial by the Court of Appeals; although we do so for different reasons.

All sitting. Minton, C.J., Cunningham, Keller, Noble and Wright, JJ., concur. Venters, J., concurs in result only by separate opinion in which Hughes, J., joins.

VENTERS, J., CONCURRING IN RESULT ONLY:

I concur in result only. While I agree with the Majority's conclusion that Kentucky River is not covered by governmental immunity in its Liberty Place operations, I would go further and say that the protective shield of governmental immunity does not extend to any aspect of Kentucky River's operation.

As a community action agency, Kentucky River is a private corporate entity that does not "exercise [any] governmental function . . . integral to state government." It was initially created to implement the federal policy of distributing federal revenue sharing money and continues to operate to implement the federal policy of distributing federal block grants for *local*, not state, projects. Federal revenue sharing and block grants were devised to bypass state government bureaucracy and get federal money directly into local programs. State government serves only as the conduit through which federal money passes to the community action agencies. Any implementation of state policy is purely coincidental. Since it is *federal* policy being implemented, nothing about it can be construed as "integral to state government" and, therefore, Kentucky River's claim of governmental immunity fails to meet the standards forth in *Comair* and *Kentucky Center for the Arts v. Berns*.

Hughes, J., joins.