RENDERED: DECEMBER 17 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0665-DG

NORTHERN KENTUCKY AREA                                         APPELLANT
DEVELOPMENT DISTRICT


                        ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2017-CA-1832
                  BOONE CIRCUIT COURT NO. 15-CI-00379


MARY WILSON                                                      APPELLEE


**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>REVERSING</u>**

The Kentucky Whistleblower Act (KWA) is an antiretaliation statute that applies to employees of the Commonwealth of Kentucky and its political subdivisions. Mary Wilson brought a KWA claim in circuit court against her former employer, Northern Kentucky Area Development District, Inc. (NKADD), alleging NKADD retaliated against her by forcing her resignation for having reported a co-worker's fraudulent billing practice.

We granted discretionary review to determine whether NKADD is one of the Commonwealth's political subdivisions, making it a KWA-covered employer and thus potentially liable for Wilson's claim. We conclude that it is not. Accordingly, we reverse the Court of Appeals' contrary holding and reinstate the trial court's summary judgment dismissing Wilson's KWA claims against NKADD.

Our opinion today addresses a legal issue of first impression, resolving the legal controversy between the parties in the present case and others who might be similarly situated. But we recognize that Kentucky Revised Statute (KRS) 147A.116(f), enacted as HB 189 in the 2017 Regular Session of the General Assembly, makes clear the legislature's intention that area development districts (ADDs) are subject to the KWA effective January 1, 2018. That statutory change does not affect the outcome of this case.

## I.  FACTUAL BACKGROUND

As a case manager for NKADD, Wilson conducted home assessments of elderly clients receiving NKADD's homecare services. On June 25, 2014, she reported a fellow case manager for billing person-to-person contacts with a client when the case manager had not, in fact, had personal contact with the client. An investigation concluded otherwise. Wilson claims after the investigation her superiors at NKADD forced her to resign on January 6, 2015.

On March 16, 2016, Wilson sued NKADD under the KWA. The trial court granted NKADD's motion for summary judgment, accepting NKADD's argument that it was not a political subdivision of the state; therefore, NKADD was not a KWA-covered employer. The Court of Appeals reversed, and we accepted discretionary review.

## II. ANALYSIS

We review the trial court's grant of summary judgment de novo, giving no deference to the legal conclusions of either of the courts below.[1]

---

[1] *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013).

## A. The Kentucky Whistleblower Act.

The KWA, codified at Kentucky Revised Statutes (KRS) KRS 61.102(1),

provides as follows:

> No employer shall subject to reprisal . . . any employee who in good faith reports, discloses, [or] divulges . . . any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

"The [KWA] serves the remedial purpose of protecting 'employees who possess

knowledge of wrongdoing that is concealed or not publicly known and who step

forward to help uncover and disclose information.'"[2] "Because the KWA serves

the public purpose of identifying governmental wrongdoing, it must 'be liberally

construed to serve that purpose.'"[3]

KRS 61.101(2) defines employer as "the Commonwealth of Kentucky or

*any of its political subdivisions.*"[4] So to prevail on a KWA claim, the employee

must prove that the employer is a "political subdivision" of the Commonwealth

of Kentucky.

## B. Statutorily, NKADD is a public agency but not a political subdivision of the Commonwealth.

NKADD is one of fifteen ADDs created by the General Assembly under

KRS 147A.050. Each ADD's board of directors is empowered under KRS

147A.080(10) to

---

[2] *Harper v. Univ. of Louisville*, 559 S.W.3d 796, 801 (Ky. 2018) (citing *Davidson v. Commonwealth, Dep't of Military Affairs*, 152 S.W.3d 247, 255 (Ky. App. 2004)).

[3] *Id.* (citing *Workforce Dev. Cabinet v. Gaines*, 276 S.W.3d 789, 793 (Ky. 2008)).

[4] (emphasis added.).

[e]nter into interlocal agreements or interstate compacts to the extent authorized by laws of the Commonwealth. An area development district organization shall be deemed a "public agency" as defined by the Interlocal Cooperation Act in KRS Chapter 65[.]

The Interlocal Cooperation Act was created to "permit public agencies . . . to cooperate with each other on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population, and other factors influencing the needs and development of local communities."[5]

In reversing the trial court, the Court of Appeals concluded Wilson proved NKADD is a political subdivision and therefore a covered employer based upon its reading of KRS 147A.080(10) and KRS 65.230. We disagree. ADDs are not specifically enumerated among the various entities defined as "public agencies" listed in KRS 65.230. And they are not enumerated as political subdivisions to implement the Interlocal Cooperation Act. The Court of Appeals took the absence of any explicit reference to ADDs in KRS 65.230 to indicate that the legislature must have intended ADDs to be *political subdivisions.*[6] We are not so persuaded. It is, of course, KRS 147A.080(10) that explicitly inserts the ADDs among the many entities falling within the definition of "public agency" for purposes of the Interlocal Cooperation Act, but that fact does not turn ADDs into political subdivisions for purposes of the KWA.

---

[5] KRS 65.220.

[6] The Court of Appeals cited dictum in *Stanford v. U.S.*, 948 F.Supp.2d 729, 736 (E.D. Ky. 2013), to support its conclusion.

4

## C. We rely on the *Comair* analysis to discern NKADD's status as a covered employer under the KWA.

Because we conclude the text of KRS 147A.080(10) and KRS 65.230 does not make clear that ADDs like NKADD are a "political subdivision[s] of the Commonwealth," we turn, as we did most recently in *Louisville & Jefferson Cty. Metro. Sewer Dist. v. Hill*,[7] to the sovereign immunity test adopted in *Comair, Inc. v. Lexington-Fayette County Urban Cnty Airport Corp.*[8] to guide our search for the answer. Under the *Comair* analysis,

> First, the courts must look to the origin of the public entity, specifically: was [the entity in question] created by the state or a county [which is not entitled to immunity except in the legislative and judicial realms]? The second and more important inquiry is whether the entity exercises a function integral to state government.[9]

Because the parties agree that ADDs were created by statute by the General Assembly, an immune parent, we focus on the second prong of *Comair*.

## D. NKADD is not a political subdivision of the state because it does not serve an integral state function.

Analysis under the second *Comair* prong requires us to consider whether the entity's function is a necessary matter of statewide concern, is governmental as opposed to proprietary, and is necessary to a state function.[10]

---

[7] 607 S.W.3d 549, 554 (Ky. 2020).

[8] 295 S.W.3d 91 (Ky. 2009).

[9] *Hill*, at 554 (quoting *Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015).

[10] *Id.*

### 1. NKADD's operation does not, on balance, concern state-wide interests.

To be considered a political subdivision of the state, the agency must address statewide concerns to be integral to a government function.[11] In deciding if an entity addresses statewide concerns, we must first determine what its function really is. The Court then considers if the concerns addressed by the entity are common to citizens statewide, even if the concerns addressed focus on a narrower geographical area.[12]

An entity addresses a statewide concern when its mission reaches all citizens. For example, in *Comair*, the local airport board was held to address a statewide concern because it operated a form of transportation, and the need to access transportation is common to all Kentucky citizens.[13] Accordingly, the airport board in its role of operating the airport, made air travel accessible to the entire state. By contrast, in *Coppage* we found the sanitation district served primarily a local interest and did not address a statewide concern because its services were offered to a discrete geographic area, even though adequate sanitation systems are of concern to local governments across the state.[14] The distinguishing factor in the outcome between *Comair* and *Coppage* lies in the localized scope of an otherwise statewide concern.

The degree of statutory guidance on the matter may also be significant in deciding if the entity addresses a statewide concern. In *Coppage*, we found the

---

[11] *River Foothills Dev. Council, Inc. v. Phirman*, 504 S.W.3d 11, 16 (Ky. 2016).

[12] *Comair*, 295 S.W.3d at 99.

[13] *Id.* at 99.

[14] *Coppage*, 459 S.W.3d at 864.

sanitation district, unlike a water district, not to be subject to a regulatory scheme.[15]  While water districts serve the statewide concern of maintaining a clean water supply, sanitization districts were not subject to the same state-wide regulation.[16]  The lack of statewide governance indicated the district did not serve statewide concerns.

If it remains seriously unclear whether an entity addresses a statewide concern because of the multiplicity of purposes it serves, the balance of its services controls.[17]  This was the issue considered in *Stanford v. United States*, which, although not binding on this court, captured the rule correctly.  In *Stanford*, the court considered the Bluegrass Area Development District's mission statement to determine if its primary goal was to serve local or state interests.[18]  BADD's mission statement reflected a principal focus on local concerns.  The court then concluded BADD served local needs slightly more than statewide matters, which tipped the scale away from statewide status.[19]  So, the variety of activities in which the agency engages, the level of state-government oversight of those activities, and the mission of the agency informs the conclusion about whether the entity under examination qualifies as addressing statewide concerns.

---

[15] *Id.*

[16] *Id.*

[17] *Stanford,* 948 F. Supp. 2d 729.

[18] *Id.* at 738.

[19] BADD's mission statement "to: Enhance the economy of our communities through planning, to maximize resources, [to establish] projects to promote development, [and to establish] programs to improve the quality of life for the citizens of the regions" expressly indicates that their programs serve a local purpose.

In the present case, the Court of Appeals found, and Wilson argues, that NKADD addresses statewide concerns because its services include caring for the elderly, a function that has been recognized in vintage caselaw as a public duty. And the Court of Appeals reasoned that because elder-care was thus a statewide concern, NKADD's role in locally facilitating the work of the state's Cabinet for Health and Family Services (Cabinet) satisfied the *Comair* test.

But the trial court ultimately concluded as a matter of law that the "interests the NKADD serves are not functions 'integral to state government', as defined by *Comair*." We agree with the trial court. When the multiplicity of services is examined holistically, NKADD serves more regional interests than statewide interests.

The local focus of ADDs generally is evident from the fact that each offers different programs depending on local needs. For example, most ADDs appear to address elder care in some form, but several of them offer no services to the homeless. The record in the present case discloses that services to the elderly are among many activities that NKADD facilitates. According to the trial court's order, NKADD engages in nearly twenty programs ranging from assisting the elderly and disabled with program-benefit distribution to helping local counties provide input about transportation at the state level. These findings are not clearly erroneous, and so must be factored in to this part of the analysis. The Court of Appeals did not properly consider these facts in determining the scope of NKADDs functions under *Comair*.

Some of the matters NKADD addresses may be common throughout the state, but the services ADDs provide are only for the local area, tailored to the

8

local area's needs, and not governed by statute. The tailoring of services to their local community indicates they primarily address local concerns. NKADD seeks solely to aid persons in the eight-county region, tailored to their specific needs, and not to serve the entire state.

### 2. NKADD does not provide a governmental function.

For an entity to be a political subdivision of the state, the entity must serve a governmental function, as opposed to a proprietary one.[20] Governmental functions are those that are a traditional or necessary part of state government.[21] Traditional state functions include the administration of transportation, the police, public education, public health, and certain public safety functions.[22] For example, in *Comair*, the airport board provided a state function by facilitating a form of transportation.[23] Therefore, the airport board was administrating the governmental function of transportation. Likewise, water districts have been repeatedly held to serve an integral state function because they are "special districts" that are created by statute to serve basic governmental functions, like securing access to water for Kentucky citizens.[24]

In contrast, the *Coppage* court held that sanitation districts were not political subdivisions of the state because the services they provide are not

---

[20] *Coppage*, 459 S.W.3d 864.

[21] *Id.* at 864 ("Sewage disposal and storm water management systems are not a traditional and necessary state function such as those functions performed by the state police, our public schools, the corrections system, and public highways and airways.").

[22] *Id.*

[23] *Comair*, 295 S.W.3d at 99.

[24] *Coppage*, at 864.

9

integral to government function.[25] The court found sanitation services—in contrast to transportation or zoning—not to be essential to Kentucky's infrastructure.[26] The Court explained that a sanitation district is distinguishable from a water district because sanitation is not specifically set aside solely to be provided by a specific entity, whereas water districts are charged by statute to carry out the governmental function of providing water.[27] In sum, an entity serves a traditional and necessary state function when the offered services are acting as part of the government.

NKADD and ADDs generally carry out proprietary, non-governmental functions. The Court of Appeals concluded that NKADD performed a state function because the services ADDs provide are influenced by statutes. The Court of Appeals' focus on only one service offered by NKADD, care for the elderly, resulted in an incomplete assessment of the entity's relationship with government.

Importantly, besides the requirement that the state approve an ADD's homecare plan for their elderly services, no laws suggested to us by Wilson or the Court of Appeals seem to dictate how ADDs provide services to the elderly. Further, the only cited statute simply directs the state funding to each ADD to develop homecare services; it does not direct the entity itself to create those services.

---

[25] *Id.* at 864.

[26] *Id.*

[27] *Id.*

Generally, the services NKADD facilitates are not governed directly by special regulations, statutes directly relating to them, or statutes that require them to offer certain programs. In contrast to a water district that is required by statute to serve a governmental function, NKADD and ADDs generally are only charged by statute with promoting cooperation among counties to serve local areas. The lack of state governance over ADDs supports the conclusion that they were created to provide local governments a way to work together to better serve their areas, independently from the state. The Attorney General's advisory opinion explaining that they serve no governmental function is additional evidence of the loose connection between ADDs and the state.[28] Therefore, the Court of Appeals was incorrect in holding that NKADD's provision of certain limited services to the elderly resulted in the performance of a state function.

A more comprehensive analysis of all NKADD's services weighs against a conclusion that its services are integral to state government. Here, NKADD is involved in a multitude of activities that facilitate services to citizens confined to its region. More importantly, as discussed, each ADD decides its own programs based on the needs of their specific region. The trial court noted that NKADD programs also included programs ranging from assisting in funding brownfield reclamation and workforce development to a program for spaying and neutering feral cats. The trial court found that only about one-third of

---

[28] KRS OAG 81-185. 65.230. ("An area development district has a basic planning function, but it has no authority to administer, manage, implement or directly operate a governmental area plan.").

11

NKADD's activities involve coordination with the Cabinet to facilitate the Cabinet's mission in the region.

Some programs ADDs offer may involve state oversight, like NKADD's homecare plans, but overall, ADDs are not heavily governed by statute and operate programs that are tailored to regional needs, instead of following the direction of the state or providing services exclusive to the state. While NKADD, and ADDs generally, are undoubtedly beneficial to the Commonwealth and assist in providing public services and resources, their programs are not a part of a government function.

### 3. NKADD is not necessary to government function.

Entities considered political subdivisions of the state must also be necessary to government functions.[29] *River Foothills Development Council, Inc. v. Phirman*[30] provides insight into when an entity is considered necessary to government functions. *Phirman* found a substance-abuse program facilitated by the council did not serve a necessary part of a state function. The council was a community action agency, governed heavily by regulations and statute. But the drug program the council facilitated was not a political subdivision of the state because drug counseling is not a traditional and necessary state function and served the same function as many private or other non-profit organizations.[31]

---

[29] *Comair*, at 102 (". . . it is sufficient because the board, by providing the airport, provides the primary means for accessing those airways, which in turn are essential for commercial and private transportation of people, cargo, and mail.").

[30] *Phirman*, 504 S.W.3d 17.

[31] *Id.* at 17.

Like the reasoning in *Phirman*, the court in *Stanford* concluded the Bluegrass Area Development District was not a political subdivision for purposes of sovereign immunity because it facilitated governmental functions but was not necessary to them. Unlike the air transportation involved in *Comair*, the court in *Stanford* found that BADD did not create infrastructure for state government services, nor did it provide anything that was essential to state services.[32] While BADD assisted local counties and cities in planning economic development and transportation services to citizens, it did not actually develop or provide those services. In other words, the entity did not provide the public transportation, it merely helped local communities organize it.

Discussing BADD's advising role in promulgating zoning ordinances, *Stanford* draws the distinction between an entity that provides nonessential assistance versus an entity that is necessary to carrying out the function.[33] While comprehensive planning and zoning could not be implemented without local planning commissions, public transportation would continue even if BADD were not there to help. So, if BADD ceased to exist, no governmental function would be eliminated, indicating it did not serve an integral government function.

The distinction between an entity "necessary to" versus one that only assists government functions is also clarified in *Coppage*. The *Coppage* court held that sanitation districts were not political subdivisions of the state

---

[32] *Comair*, 295 S.W.3d 91; *Stanford*, 948 F.Supp.2d at 739.

[33] *Stanford*, 948 F.Supp.2d at 737.

13

because the services are not integral to government function.[34]  The Court found sanitation services to be critically important, but sanitation districts were not critical in providing the service because, unlike water districts, other entities, like cities, also provide for sanitation.[35]

Importantly, ADDs are similar to the sewer districts in *Coppage.* ADDs like NKADD are not the sole provider of a service needed statewide.  Elderly care, for instance, may be a statewide concern, and Meals-On-Wheels may be a service ADDs offer to the elderly, but NKADD is not the only provider of that service.  For example, churches or other non-profit organizations also often provide that service.  Similarly, NKADD, as well as other organizations like local tourism groups, help implement economic development programs and employment opportunities, despite employment and the economy generally being matters common across the state.

While NKADD provides planning for transportation services in non-urban counties, the act of planning for more widespread public transportation is much different than providing the transportation.[36]  The entity providing the public transportation, like the airport board in *Comair,* is essential to its implementation, however, the entity planning for it to be offered in a more widespread manner, like NKADD, is not.[37]

---

[34] *Coppage,* 459 S.W.2d 864.

[35] *Id.*

[36] *Standford,* at 737.

[37] *Id.* at 739.

In sum, ADDs provide a multitude of local services, few of which are governed by statute. NKADD is an organizational entity, not one that is necessary to the services it provides. Therefore, the role of NKADD is not integral to a governmental function. We conclude that under *Comair*, NKADD is not a political subdivision of the state.

### III.    CONCLUSION

Under the *Comair* test NKADD is not a political subdivision of the state because while it was created by the General Assembly according to statute, it does not serve an integral function of government. NKADD serves primarily local interests and merely assists public agencies in certain limited ways. Therefore, at least as to those claims filed before January 1, 2018, including Wilson's, NKADD was not subject to the KWA as a political subdivision and is therefore not subject to such claims thereunder. Accordingly, we reverse the Court of Appeals and reinstate the summary judgment issued by the trial court.

Minton, C.J., Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. Hughes, Keller, Lambert and VanMeter concur. Wright, J., concurs in result only by separate opinion. Nickell, J., not sitting.

WRIGHT, J., CONCURRING IN RESULT ONLY: While this issue is not raised on appeal, I write separately to note that, if it were, I would have reached a different result. Although the Northern Kentucky Area Development District, Inc. ("NKADD") is not a political subdivision of the state, it is an agent of the Commonwealth of Kentucky. Therefore, had the issue been raised, I would

15

have voted to affirm the Court of Appeals because the NKADD is an employer under the Kentucky Whistleblower Act.

As we have held—and the majority acknowledges—"the [Kentucky Whistleblower Act] serves the public purpose of identifying governmental wrongdoing, it must be 'liberally construed to serve that purpose.'" *Harper v. Univ. of Louisville*, 559 S.W.3d 796, 801 (Ky. 2018) (quoting *Workforce Dev. Cabinet v. Gaines*, 276 S.W.3d 789, 793 (Ky. 2008)). It also serves the purpose of "protect[ing] employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information." *Workforce Dev. Cabinet v. Gaines*, 276 S.W.3d 789, 792 (Ky. 2008) (citation and internal quotation marks omitted).

The entire analysis for determining an "employer" under the Whistleblower Act must consider the second part of the statutory definition, KRS 61.102(2). I agree with the majority's *Comair* analysis and that NKADD is not "the Commonwealth of Kentucky or any of its political subdivisions." However, I note the second sentence adds to the definition of "employer" and expressly provides, "**[e]mployer also includes any person authorized to act on behalf of the Commonwealth, or any of its political subdivisions**, with respect to formulation of policy or the supervision, in a managerial capacity, of subordinate employees." *Id.* (emphasis added).

When determining an "employer" under the Whistleblower Act, we must consider the full statutory definition. "It is well-settled that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.'"

16

*Cabinet for Families & Children v. Cummings*, 163 S.W.3d 425, 430 (Ky. 2005) (quoting *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir. 1997)). Furthermore, our statutes "shall be liberally construed with a view to promote their objects and carry out the intent of the legislature." KRS 446.080(1).

My analysis turns on the meaning of the second sentence of the statutory definition—whether NKADD is "authorized to act on behalf of the Commonwealth or any of its political subdivisions." If so, it is an employer under the statutory definition of the Whistleblower Act. This interpretation of the scope of our Whistleblower Act is reinforced by our case law:

> Accordingly, since KRS 61.101(2) and Title VII share references to agents, while the Kentucky Civil Rights Act does not, Title VII's definition is more analogous to the definition in Kentucky's Whistleblower Act than is the definition contained in Kentucky's Civil Rights Act. Thus, cases interpreting Title VII's definition of employer, as well as the definitions contained in the ADEA, 29 U.S.C.A. § 630(b) ("'Employer' means a person engaged in an industry affecting commerce . . . [and] any agent of such person."), and the ADA, 42 U.S.C.A. § 12111(5)(A) ("'Employer' means a person engaged in an industry affecting commerce … and any agent of such person."), are **helpful and applicable in determining the scope of similar language in Kentucky's Whistleblower Act because "'all the definitions of employer in these statutes are worded to cover the "agent" of the employer**.'"

*Cummings*, 163 S.W.3d at 432 (emphasis added) (citation omitted).

As the majority states, KRS 205.460 requires the Cabinet for Health and Family Services to contract with agencies, such as NKADD, to deliver "essential services" to elderly residents, and NKADD receives state funding for this purpose. This case involves allegations arising out of this particular service to the elderly. NKADD was certainly "authorized to act on behalf of the Commonwealth," and NKADD is an employer under the Kentucky

17

Whistleblower Act. Therefore, if this issue were property before the Court I would affirm the Court of Appeals. However, because the issue was not raised, I concur with the result of the majority opinion.

COUNSEL FOR APPELLANT:

Jeffrey Charles Mando
Jennifer Haddad Langen
Adams, Stepner, Woltermann & Dusing, PLLC

COUNSEL FOR APPELLEE:

Shane Christian Sidebottom
Ziegler & Schneider, P.S.C.